# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

CASTELLANO COSMETIC
SURGERY CENTER, P.A.,
a Florida corporation,

      Plaintiff,

         v.                             Case No. 8:21-cv-1088-KKM-CPT

RASHAE DOYLE, P.A., a Florida
corporation, and GRACE RASHAE
DOYLE an individual,

      Defendants.

_____/

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

This action arose following the end of a business relationship between Castellano

Cosmetic Surgery Center (Castellano), a plastic surgery center, and Rashae Doyle, P.A.,

a corporation founded by Grace Rashae Doyle, which contracted to perform cosmetic

procedures for Castellano. Based on allegations that Ms. Doyle stole client information

and sent an email to Castellano clients announcing the her new business, BevelUp,

Castellano brings claims of misappropriation of trade secrets under the Defend Trade

Secrets Act (DTSA); misappropriation of trade secrets under the Florida Uniform

Trade Secrets Act (FUTSA); breach of contract; common law unfair competition;

violation of the Computer Fraud and Abuse Act (CFAA); violation of the Florida

Computer Abuse and Data Recovery Act (CADRA); and tortious interference with

existing and prospective business relationships. Ms. Doyle contends that Castellano consented to the creation of the client list she used for marketing purposes, and any inclusion of Castellano clients (as opposed to her own) was not intentional misappropriation. Castellano seeks a preliminary injunction to prevent further misappropriation of its alleged trade secrets. But because it has not shown a substantial likelihood of success on the merits and has not articulated irreparable harm, the motion is denied.

## I.   FACTS

In May 2016, the parties entered a contract (the 2016 Agreement) which required Ms. Doyle to provide cosmetic procedures for Castellano and allowed her to treat clients at Castellano's facility as an independent contractor. (Doc. 38-1). The 2016 Agreement included a confidentiality provision and a non-solicitation provision. Castellano also agreed that Ms. Doyle's clients did not become Castellano clients simply because she treated them at Castellano's facility.

Castellano has been cultivating elite clients since 2011 and stores client information in an electronic medical record (EMR) system. PatientNow, a third party, hosts Castellano's EMR system, initially using a server-hosted database until converting to a cloud-hosted database in 2020. The EMR database contained names, addresses, email addresses, demographic information, and medical information. Castellano made concerted efforts to keep this information secret, including: (1) restricting access by log-in and password, (2) monitoring front desk computers, and (3) requiring confidentiality,

non-disclosure, and non-solicitation agreements from independent contractors who had access to the EMR. When clients who had seen Ms. Doyle prior to 2016 were treated at Castellano, their information was added to Castellano's EMR system.

In May 2018, Ms. Doyle downloaded a list of clients from Castellano's EMR system. Ms. Doyle claims that Pamela Horton, Castellano's office manager, authorized her to do so and provided her instructions on how to download a list of clients that she had seen. Ms. Doyle maintains she needed the access after her personal computer, which housed her independent list, crashed and proved unrecoverable. Castellano contends that no one gave Ms. Doyle access or authorization to download such a list, and the only way Ms. Doyle could have obtained such a list was through calling PatientNow. Whether with or without authorization, it is undisputed that Ms. Doyle downloaded a list of clients in May 2018. *See* (Doc. 38-5). Ms. Doyle then forwarded the list to both her own and her husband's personal email addresses, converted it to an Excel spreadsheet, and, on a separate sheet within the spreadsheet, continued to add new clients she saw over the course of the next few years.

Eventually, the relationship between Ms. Doyle and Castellano soured, and they executed a separation agreement (the 2020 Agreement) to resolve a dispute over client records, among other things. Castellano agreed to provide Ms. Doyle with treatment notes, plans of care, and documents related to 279 clients. These clients represented those in the Castellano EMR system that indicated they were referred by Ms. Doyle. The 2020 Agreement also contained the following merger clause that rendered the 2016

3

Agreement "null and void":

> Any and all prior understandings and agreements between RDPA and
> CCSC, including but not limited to the agreement entered into between
> the Parties in 2016 (the "2016 Agreement"), with respect to the subject
> matter of this Agreement are merged into this Agreement, which fully and
> completely expresses the entire Agreement and understanding of RDPA
> and CCSC with respect to the subject matter hereof. The 2016 Agreement,
> which contains a non-solicitation provision, is null and void, and there are
> no other agreements between the Parties other than the 2016 Agreement.

(Doc. 38-2 at 4).

In 2021, Ms. Doyle started a new business called BevelUp. On April 10, 2021, BevelUp sent an email blast to announce its grand opening. The announcement was sent to the email addresses on the list Ms. Doyle downloaded in 2018 along with other email addresses she had added to her Excel spreadsheet since that time. This announcement led to the instant lawsuit and motion for preliminary injunction, as it was sent to Castellano's general information email address.

Four witnesses testified at the evidentiary hearing on the motion for a preliminary injunction. First, Castellano called Pamela Horton, Castellano's office manager. Ms. Horton testified that Ms. Doyle was granted permission only to download commission reports, which displayed a list of patients seen by Ms. Doyle and her anticipated commissions from those visits. Ms. Horton also testified that Ms. Doyle never asked her for instructions on how to download a list of her clients from the EMR system in May 2018 and that she never gave any such instructions. On cross-examination, Ms. Horton testified that the EMR system did not have tiered access, i.e., different levels

4

that would have prevented Ms. Doyle from downloading client information on her own. Per Ms. Horton, by virtue of access to the commission reports, Ms. Doyle also had access to all client data, even though she did not have permission to download it.

Castellano then called Jane Gustin, its marketing director. Ms. Gustin testified that email marketing was the primary way Castellano communicated with its clients and that Castellano cultivated its email list at a high cost. According to Ms. Gustin, the email addresses included on the list represented an immense value to Castellano. She also denied providing instructions on how to download a client list to Ms. Doyle.

Next, Castellano called Dr. Joseph Castellano, the owner of the center. He testified that the he discovered Ms. Doyle's email announcement by checking the info@castellanocosmeticsurgery.com email address, which had received the announcement. Castellano uses this email address as a catch-all for general inquiries and as a placeholder within the EMR system. Regarding the particulars of Ms. Doyle's access, Dr. Castellano testified that she was given access and authorization to download commission reports from the EMR, but that she did not have access to all the reports on the system (unlike Ms. Horton's testimony, which was that Ms. Doyle had access but not authorization to all reports). He testified that he also never provided Ms. Doyle permission to generate the 2018 list. He speculated that the only way she could have downloaded the client list in 2018 was by calling PatientNow, the third party that hosted the EMR system, and requesting access. By Dr. Castellano's account, a simple log in to the system would not grant access to a full client report because he placed limitations

in the EMR system to prevent Ms. Doyle's unencumbered access.

Finally, Castellano called Ms. Doyle. She testified that she maintained an independent list of the clients she saw on her personal computer. This list included the patients she saw prior to her time with Castellano and those she had acquired while performing services at Castellano. In May 2018, her personal computer crashed, and she was unable to recover this list. She testified that Ms. Horton provided instructions on how to download a list of clients that she had seen while at Castellano from the EMR system and that she did so with Ms. Horton's consent.

After she left Castellano in 2020, Ms. Doyle started her own business called BevelUp. She consolidated a list of email addresses for marketing purposes, including the 2018 download, a list of patients she received from the cosmetic surgery center she worked at prior to starting BevelUp, and other email addresses of people she knew who might be interested in her business. Ms. Doyle insisted that she did not know that the 2018 downloaded list included clients who were not her own until she was served with the Complaint. Since then, she testified that she has not used the 2018 list and is slowly segregating clients she never saw while at Castellano from the email list.

As for her access to the Castellano EMR system while working there, Ms. Doyle testified that she enjoyed full access to information on the system, but was limited by her lack of knowledge of how to generate reports. Specifically, she did not need any special password or log-in credentials to run the client report, and she requested instructions only because Ms. Horton was the point person for administrative issues.

6

Ms. Doyle denied calling PatientNow to obtain access to the list.

## II.   PROCEDURAL BACKGROUND

Castellano filed this action on May 5, 2021, and filed its Motion for Preliminary Injunction (Doc. 4) on May 7, 2021. The Court set a hearing on the motion for May 25, 2021. (Doc. 6). The parties filed a joint motion to postpone the hearing, so the Court rescheduled the hearing for June 1, 2021. (Docs. 9 & 10). Once again, the parties jointly moved to continue the hearing. (Doc. 12). The Court granted the motion and instructed the parties to file a request for hearing on the motion. (Doc. 13). The parties filed a joint motion requesting a hearing date of July 9, 2021. (Doc. 15). The Court granted the motion in part and set an evidentiary hearing for July 14, 2021. (Doc. 16).

At the start of the hearing, the Court informed the parties that, based on its review of the papers, Castellano would likely be unable to demonstrate success on the merits and irreparable harm for its claims of breach of contract,[1] unfair competition,

---

[1] As to the breach of contract claim, the 2020 Agreement set forth the terms of separation between the parties and declared the 2016 Agreement "null and void." A plain reading of the 2020 Agreement conveys that the legal effect of the 2016 Agreement was fully destroyed by this clause. *See Void*, *Black's Law Dictionary* (11th ed. 2019) ("Of no legal effect; to null"); *Null*, *Black's Law Dictionary* ("Having no legal effect; without binding force"). The "null and void" clause, coupled with the express mention of the non-solicitation provision immediately preceding it, almost certainly renders the 2016 Agreement without effect, defeating Castellano's claim that Ms. Doyle breached the 2016 Agreement. Castellano's claim that Ms. Doyle breached the 2020 Agreement by intentionally interfering with its business is not substantially likely to succeed because Castellano has not alleged interference with a single existing client relationship and failed to proffer credible evidence that such interference was intentional. *Cf. Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994) ("As a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered."). Nor has Castellano explained why the breach of the 2020 Agreement creates irreparable harm that cannot be remedied by monetary damages.

and tortious interference.[2] During a brief recess, the parties conferred and agreed to proceed on the motion for a preliminary injunction only on the misappropriation of trade secrets and computer fraud claims.

## III.   LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Am. Civ. Liberties Union of Fla., Inc. v. Miami–Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (quoting *All Care Nursing Servs., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989)). To obtain an injunction, a movant must show: (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury absent an injunction; (3) the threatened injury to the movant outweighs the harm an injunction may cause the party opposing the injunction; and (4) an injunction would not disserve the public interest. *Id.* "Failure to show any of the four factors is fatal" to a motion for preliminary injunction. *Id.*

"A showing of irreparable injury is the sine qua non of injunctive relief." *Siegel v.*

---

[2] As to the unfair competition and tortious interference claims, the Court concluded that because it found Castellano was likely to prove that the client list was a trade secret, *see infra*, these tort claims were likely displaced by Florida statute. *See* § 688.008, Fla. Stat. ("[FUTSA] displace[s] conflicting tort, restitutory, and other law of this state providing civil remedies for misappropriation of a trade secret."); *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1294–95 (S.D. Fla. 2018) (Bloom, J.) (finding claim for unfair competition displaced where misappropriation of a trade secret comprised the underlying wrong); *Am. Registry, LLC v. Hanaw*, No: 2:13–cv–352–FtM–29CM, 2014 WL 12606501, at *6–7 (M.D. Fla. July 16, 2014) (Steele, J.) (concluding tortious interference claim was displaced by section 688.008, Florida Statutes, where plaintiff alleged the defendants interfered with customer relationships by converting proprietary information and soliciting customers). Neither party offered any argument as to why FUTSA does not displace these torts here.

8

*LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quotations omitted). A showing of irreparable injury must be "neither remote nor speculative, but actual and imminent." *Ne. Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quotation omitted). "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Id.*

"[W]here facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312 (11th Cir. 1998). At an evidentiary hearing, the Court sits as both factfinder and assessor of credibility. *See Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1211 (11th Cir. 2003). Highly disputed factual issues may cast doubt on the plaintiff's substantial likelihood of success.

## IV.   ANALYSIS

Castellano argues that Ms. Doyle violated the Defend Trade Secrets Act (DTSA), the Florida Uniform Trade Secrets Act (FUTSA), the Computer Fraud and Abuse Act (CFAA), and the Florida Computer Abuse and Data Recovery Act (CADRA). As prejudgment relief, it asks this Court to enjoin Ms. Doyle from soliciting or initiating contact or communication with any client of Castellano except those 279 clients identified in the 2020 Agreement and from continuing to use the allegedly misappropriated client list. (Doc. 4). Because Castellano has demonstrated neither a substantial likelihood of success on the merits of its claims nor irreparable harm resulting from Ms. Doyle's behavior, it has not met its burden to obtain the

extraordinary remedy of a preliminary injunction.

## A. Misappropriation of Trade Secrets

### i.  Substantial Likelihood of Success on the Merits

Castellano claims Ms. Doyle misappropriated its trade secrets in violation of the DTSA, 18 U.S.C. § 1836(b), and the FUTSA, § 668.001–.009, Fla. Stat. To succeed on its DTSA and FUTSA claims, Castellano must prove that Ms. Doyle disclosed or used a trade secret without the express or implied consent of Castellano and "at the time of disclosure or use, [Ms. Doyle] knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B)(ii)(II); *see also* § 688.002(2) (providing a nearly identical definition of misappropriation); *Freedom Med., Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, 1275 n.6 (M.D. Fla. 2020) (Dalton, J.) ("DTSA and FUTSA can be analyzed together."). Castellano has sufficiently shown for purposes of the preliminary injunction motion that the client list is likely a trade secret and that Ms. Doyle used it in announcing her business, BevelUp. But it has not shown a substantial likelihood of success in proving that Ms. Doyle used the client list with knowledge that the list was acquired under circumstances giving rise to a duty to maintain the secrecy of these trade secrets.

DTSA defines misappropriation in the following alternative ways:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(B) disclosure or use of a trade secret of another without express or implied

consent by a person who--
    (i) used improper means to acquire knowledge of the trade secret;
    (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--
        (I) derived from or through a person who had used improper means to acquire the trade secret;
        (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
        (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
    (iii) before a material change of the position of the person, knew or had reason to know that--
        (I) the trade secret was a trade secret; and
        (II) knowledge of the trade secret had been acquired by accident or mistake;

18 U.S.C. § 1839(5).

Castellano's motion alleges misappropriation under only the definition in § 1839(5)(B)(ii)(II)—misappropriation by use of a trade secret when "at the time of disclosure or use," the person "knew or had reason to know" that the trade secret was "acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret." (Doc. 4 at 9). The motion does not specify a particular definition under FUTSA but relies on the proposition that the definitions are identical. At the hearing, counsel for Castellano attempted to add an argument regarding improper acquisition (as opposed to use) by Ms. Doyle, but the Court limits its decision to arguments raised in the motion for preliminary injunction. *See* Fed. R. Civ. P. 7(b)(1)(B) (requiring a motion to "state with particularity the grounds for seeking the order"); Local Rule 3.01(a) (requiring that a motion include "a statement of the basis for the request"); *see also*

*Advantus, Corp. v. T2 Int'l, LLC*, No. 313CV240J99MMHTEM, 2013 WL 12122313, at *9, n.12 (M.D. Fla. May 30, 2013) (Howard, J.) (declining to consider arguments raised "for first time during oral argument" at a preliminary injunction hearing).

Both the DTSA and the FUTSA define a trade secret as information that derives economic value from not being generally known to others, the owner of which has taken reasonable measures to keep secret. 18 U.S.C. § 1839(3); § 688.002(4), Fla. Stat. Florida courts have routinely found customer lists to be trade secrets under both statutes when their compilation required "great time and expense." *See, e.g.*, *Aquent LLC v. Stapleton*, No. 6:13–cv–1889–Orl–28DAB, 2014 WL 117095, at *2 n.3 (M.D. Fla. Jan. 13, 2014) (Antoon, J.); *Freedom Med.*, 469 F. Supp. 3d at 1275; *Regions Bank v. Raymond James & Assocs., Inc.*, No. 6:20-cv-658-Orl-40EJK, 2020 WL 7419650, at *4 (M.D. Fla. Apr. 20, 2020) (Byron, J.). Here, Ms. Gustin testified that return customers comprised a substantial source of revenue and that Castellano marketed to these customers through email. Dr. Castellano testified that the practice cultivated the email list over many years and that it had expended many resources to create the list. The Court credits this testimony and finds that there is a substantial likelihood Castellano can prove that the client email list has independent economic value. Not only is this list carefully curated, it is a marketing tool that has independent economic value because it is exclusive to Castellano and not available to the public.

Castellano further presented evidence that it took reasonable measures to keep the client email list secret. Both Ms. Horton and Dr. Castellano testified that the list is

maintained on a computer database that is password protected and that not all employees and contractors had access to the EMR system. Further, Dr. Castellano testified that the practice required employees and contractors to sign confidentiality agreements, and in fact, presented evidence of a confidentiality agreement in the form of the 2016 Agreement with Ms. Doyle.[3] *See Se. Mech. Servs., Inc. v. Brody*, No. 8:08–CV–1151–T–30EAJ, 2008 WL 4613046, at *12 (M.D. Fla. Oct. 15, 2008) (Moody, J.) (finding plaintiff employed "reasonable efforts" where plaintiff used a restricted computer system which required passwords, limited access to employees, and mandated confidentiality agreements).

Ms. Doyle countered this evidence by arguing that some customer information was publicly available through online reviews, such as clients' names. But Ms. Doyle did not present evidence that most client *email addresses* were publicly available. At best, Ms. Doyle elicited testimony that an Instagram user might provide his or her email address on his or her Instagram page or through a personal message. Further, the fact that some of the information contained within the client email list may be available through other means does not discount that the compilation of that data was reasonably kept secret. *See Sexual MD Sols., LLC v. Wolff*, No. 20-20824-CIV-O'SULLIVAN, 2020 WL

---

[3] Castellano argues that the Health Insurance Portability and Accountability Act (HIPAA), which prevents the dissemination of individually identifiable health information, protects the secrecy of the client data. But HIPAA, by itself, cannot be the sole reasonable measure to maintain secrecy. Rather, Castellano must ensure through other means that HIPAA is complied with by those who have access to the health information. And here, it is not the underlying heath information that constitutes the trade secret, but the email addresses associated with the clients.

2197868, at *14 (S.D. Fla. May 6, 2020) (O'Sullivan, J.) ("[E]ven if the bases for the information is publicly available from other sources, a unique compilation of that information specifically tailored to a particular market may qualify as a trade secret."). Accordingly, Castellano has presented sufficient evidence that it is substantially likely to succeed in proving that the client list is a trade secret.

Castellano has not, however, met its burden of showing that it is substantially likely to succeed in proving that the client list was "use[d]" by Ms. Doyle "without express or implied consent" with the knowledge that it was "acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." § 1839(5)(B)(ii)(II). Ms. Doyle testified that she was given consent by Ms. Horton in the form of instructions on how to download her own client list to replace the one she lost, although Ms. Horton testified that she never gave these instructions. Ms. Doyle also testified that she did not know the 2018 client list was overinclusive until after sending the email announcement, thereby undercutting the "knowingly" or "should have known" element of misappropriation. A reasonable jury could credit either version of events, which makes it equally likely that Ms. Doyle will prevail. Thus, Castellano has not shown that it is *substantially* likely to succeed. *See Ritchie Bros. Auctioneers (Am.), Inc. v. Best Rental Corp. SE*, No. 3:14CV36-MHT, 2014 WL 896992, at *2 (M.D. Ala. Mar. 6, 2014) (Thompson, J.); 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.3 (3d ed. 2021) ("In many cases the existence of a factual conflict, or of difficult questions of law, may create sufficient

14

doubt about the probability of plaintiff's success to justify denying a preliminary injunction.").

Further, the legal issues as to the duty to maintain secrecy by Ms. Doyle weigh against finding a substantial likelihood of success on the merits. It is undisputed that Ms. Doyle acquired the client email list in 2018 when she was bound by the confidentiality clause in the 2016 Agreement (although a factual dispute remains whether she knew or had reason to know she obtained trade secrets through the download). But Ms. Doyle used the client list in 2020, after the execution of the 2020 Agreement, which declared the confidentiality provision in the 2016 Agreement "null and void." (Doc. 38-1 at 4). This provision of the 2020 Agreement renders the confidentiality clause in the 2016 Agreement "of no legal effect" and "without binding force." *See supra* note 1. This legal wrinkle due to the merger provision poses a problem for Castellano's ability to prove that Ms. Doyle acquired the client list "under circumstances giving rise to a duty" to keep the list confidential, or at least raises the specter of doubt about whether the duty governed at the time of use in 2021.

The misappropriation subsection under which Castellano presses its argument defines misappropriation as the use of a trade secret by someone who knew at the *time of use* that the trade secret was "acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B)(ii)(II). Neither the text of the statute nor the caselaw interpreting it clearly delineate whether the duty to maintain secrecy must exist at the *time of use* of the trade

15

secret or whether the duty needs to exist only when the trade secret was *acquired*. The text provides two temporal considerations: first "at the time of disclosure or use" and later when the trade secret was "acquired." *Id.*

Indeed, most claims under this subsection of the statute seek to enforce confidentiality clauses that extend beyond the termination of employment and are thus still operative, not one that was operative when the trade secret was acquired but have since become "null and void" when the use occurred. *See, e.g.*, *Am. Mariculture, Inc. v. Syaqua Ams., Inc.*, No. 2:20-cv-711-JES-MRM, 2021 WL 2315003, at *6 (M.D. Fla. June 7, 2021) (Steele, J.); *Protegrity Corp. v. Elavon Inc.*, No. 1:18-CV-00140-ELR, 2018 WL 8949789, at *4 (N.D. Ga. Aug. 22, 2018) (Ross, J.). Here, because the 2016 Agreement was no longer of legal effect when Ms. Doyle used the client email list in 2020, Ms. Doyle might not have been under an obligation to maintain their secrecy. *See EMC Outdoor, LLC v. Stuart*, No. 17-5172, 2021 WL 1224064, at *9 (E.D. Pa. Mar. 31, 2021) (Quiñones, J.) (concluding that the plaintiff did not misappropriate trade secrets where plaintiff acquired the trade secrets during her employment but the alleged duty of confidentiality arose under an employment agreement and that duty extended after her employment only if she resigned and the plaintiff was fired).

Of course, the parties never addressed—in their briefing or at the hearing—any of the above discussion. As a result, they did not make coherent arguments as to what duties existed when and which ones might be the basis of Ms. Doyle's alleged misappropriation. In the light of these unbriefed legal issues and that certain factual

disputes remain a pure question of credibility, Castellano, who bears the burden of persuasion, simply has not met the high threshold necessary for a preliminary injunction.

> ii.  Irreparable Harm

Even if Castellano has shown a substantial likelihood of success on the merits of its misappropriation claims, it has not shown that it will suffer irreparable harm in the absence of a preliminary injunction. Castellano claims there is a presumption of irreparable harm for misappropriation of trade secrets under Florida law and relies almost exclusively on that presumption to justify its request for a preliminary injunction. But this reliance is misplaced and, apart from a presumption of harm, Castellano has not articulated an actual and imminent harm it will suffer without this injunction.

Under Florida law, there is a statutory presumption of irreparable injury stemming from the violation of a valid restrictive covenant. *See* § 542.335(1)(j), Fla. Stat.; *N. Am. Prods. Corp. v. Moore*, 196 F. Supp. 2d 1217, 1230 (M.D. Fla. 2002) (Hodges, J.) ("Thus, once the party requesting enforcement of the restrictive covenant establishes one or more 'legitimate business interests' justifying the restriction, irreparable injury must be presumed by the Court and the burden shifts to the defendant to establish the absence of such injury."). To be sure, this presumption is often applied in cases involving misappropriation of trade secrets because misappropriation claims are frequently brought with claims of breach of restrictive covenants. *See, e.g.*, *Freedom Med.*, 469 F. Supp. 3d at 1278; *Regions Bank*, 2020 WL 7419650, at *5. But neither FUTSA nor

17

DTSA contains the same statutory presumption that the restrictive covenant statute does, and the Court may not read one into the statute where the text does not provide one. Thus, any presumption must be a judicially created one.

But Castellano has not cited a single binding case—either from the Eleventh Circuit or a Florida court—that holds that there is a presumption of irreparable injury for misappropriation of trade secrets. In its supplemental briefing, Castellano cites *Southeastern Mechanical* for the proposition that "irreparable harm is presumed when a party appropriates or intends to appropriate trade secrets for its own use or the use of another unauthorized party." 2008 WL 4613046, at *15. But *Southeastern Mechanical* cites *PSC, S.A. v. PriceSmart, Inc.*, No. 07–21383–CIV, 2007 WL 2781021, at *5 (S.D. Fla. Sept. 19, 2007) (Brown, J.), for that proposition, and *PSC* in turn cites section 812.035, Florida Statutes, which provides for injunctive relief for *civil theft* of trade secrets, which is a distinct cause of action under Florida law. *See* § 812.081(2), Fla. Stat.

Castellano also relies on *Aquent*, another case apparently standing for the proposition that irreparable injury is presumed in an action for injunctive relief with respect to misappropriation of trade secrets. 2014 WL 117095, at *3. *Aquent* relies upon *Dotolo v. Schouten*, 426 So. 2d 1013, 1015 (Fla. 2d DCA 1983), which is a pre-FUTSA case applying a Florida common law cause of action that was expressly displaced by FUTSA. *See* § 688.008, Fla. Stat. ("[FUTSA] displace[s] conflicting tort, restitutory, and other law of this state providing civil remedies for misappropriation of a trade secret."). Because there is no express presumption of irreparable harm in FUTSA and no binding

caselaw to suggest that the presumption applies regardless of the statutory text, the Court will not create a presumption of irreparable harm.[4] *See Everest Nat'l Ins. Co. v. Rockhill Ins. Co.*, No. 8:16-cv-2803-T-35JSS, 2016 WL 8914546, at *5–6 (M.D. Fla. Nov. 10, 2016) (Scriven, J.) (questioning whether a presumption of irreparable harm is available for FUTSA claims); *Liberty Am. Ins. Grp., Inc. v. WestPoint Underwriters, L.L.C.*, 199 F. Supp. 2d 1271, 1304 (M.D. Fla. 2001) (Kovachevich, C.J.) (recognizing a presumption of irreparable injury in copyright infringement cases and in cases seeking enforcement of non-compete agreements under Florida law but noting "that proposition is not clear cut as to trade secret misappropriation").

Without a presumption, Castellano is left with speculation of an impending loss of goodwill. But Castellano has not provided evidence of a single client who has left its practice for Ms. Doyle nor any direct testimony from any client about his or her worsened impression of Castellano's practice due to the announcement of BevelUp. Castellano offers only secondhand testimony (hearsay) of one phone call inquiring

---

[4] Even if the Court did recognize a presumption of irreparable harm in this case, Ms. Doyle has rebutted it. First, Castellano's delay in pursuing the preliminary injunction rebuts the presumption of irreparable harm. *See Future Metals LLC v. Ruggiero*, No. 21-civ-60114 -Ruiz/Strauss, 2021 WL 1701568, at *18–19 (S.D. Fla. Apr. 13, 2021) (Strauss, J.), *report and recommendation adopted* 2021 WL 1699877 (finding consent to a 45-day delay a rebuttal of a presumption of irreparable harm). Further, the Court finds credible Ms. Doyle's testimony that she is no longer using the list and instead is sequestering the improper information from her marketing email list. Because there is no evidence of any lost clients or other imminent and actual harm, a preliminary injunction is not justified on this record. The Court also finds credible her testimony that she has a large number of longstanding clients from before her time at Castellano. *Cf. TransUnion Risk & Alt. Data Sols., Inc. v. Challa*, 676 F. App'x 822, 825–26 (11th Cir. 2017) (finding presumption of irreparable injury rebutted where district court credited defendant's testimony that he had not and would not use proprietary information at his new place of employment).

about the email blast without any details regarding who made the call and whether the call shows a loss of goodwill. Castellano rightly notes that in *Ferrero v. Assoc. Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991), the Eleventh Circuit concluded that a loss of goodwill may be irreparable harm. But importantly, the Eleventh Circuit held that "the loss of *customers* and goodwill is an 'irreparable' injury" and affirmed a district court's grant of a preliminary injunction where the district court determined that the plaintiff *would* lose goodwill and customers. *Id.* (emphasis added). Here, there is no such certainty. Ms. Doyle testified that she has not used the list since the announcement via email and the inception of the lawsuit and is attempting to segregate the information that was allegedly misappropriated. The Court finds this testimony credible, particularly in the absence of any testimony by a client of Castellano.

Further, the delayed pursuit of the preliminary injunction discounts any alleged irreparable injury. Castellano received the email announcement from Ms. Doyle on April 10, 2021, and moved for a preliminary injunction on May 7, 2021. (Docs. 1 & 4). The Court set a hearing on the matter for May 25, 2021. (Doc. 6). At the request of the parties, the Court continued the hearing to June 1, 2021. (Doc. 10). The parties requested a second continuance, and the Court granted the motion and instructed the parties to file a request for a hearing with a specified date. (Doc. 13). On June 7, 2021, the parties requested a hearing date of July 9—two months after the filing of the motion and almost three months after Castellano learned of the use of the email addresses. (Doc. 15). The Court set the hearing for July 14, 2021. (Doc. 16). In the intervening

20

time, Ms. Doyle filed a motion to dismiss; Castellano filed an amended complaint; both parties have engaged in discovery and even scheduled mediation. (Docs. 21, 24, & 43). By the time the Court held the hearing on the motion for preliminary injunction, the motion had been pending for 68 days, with most of the time due to the joint request of Castellano. "A delay in seeking a preliminary injunction of even only a few months— though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). Here, Castellano's consent to the delay weighs against a finding of irreparable injury. *See Marketran, LLC v. Brooklyn Water Enters.*, No. 9:16-cv-81019-WPD, 2016 WL 8679294, at *1 (S.D. Fla. Aug. 8, 2016) (Dimitrouleas, J.) ("Given the fact that Plaintiff seeks a three month extension of time for the Court to rule on the Motion for Preliminary Injunction, which cuts against the factor of irreparable harm, it would appear that the 'extraordinary and drastic remedy' of preliminary injunctive relief is not appropriate at this time.").

Because Castellano has not shown a substantial likelihood of success on the misappropriation claims and has not shown that irreparable harm would result in the absence of equitable relief, it cannot obtain a preliminary injunction based on its misappropriation claims.

### B. Computer Fraud

Castellano also alleges that Ms. Doyle violated both the Computer Fraud and Abuse Act (CFAA) and the Florida Computer Abuse and Data Recovery Act (CADRA) by downloading the client list from the Castellano EMR system. Because Castellano has

not presented evidence to support its theory that Ms. Doyle exceeded her authorized access or evidence of a loss sufficient to satisfy the CFAA and because Castellano has not shown irreparable injury, it cannot obtain a preliminary injunction based on these claims.

i.  Substantial Likelihood of Success on the Merits

To succeed on a claim under the CFAA, Castellano must prove that Ms. Doyle "(1) intentionally 'accessed' a computer, (2) lacked authorization or exceeded [her] authorized access to the computer, (3) obtained information from the computer, and (4) caused a loss of at least $5,000.00." *Clarity Servs., Inc. v. Barney*, 698 F. Supp. 2d 1309, 1313 (M.D. Fla. 2010) (Merryday, J.); *see also* 18 U.S.C. § 1030(a)(2)(C) (proscribing "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] . . . information from any protected computer"). The CFAA defines "exceeds authorized access" as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."[5] 18 U.S.C. § 1030(e)(6). Similarly, under CADRA, Castellano must prove that Ms. Doyle "knowingly and with intent to cause harm or loss . . . [o]btain[ed] information from a protected computer without authorization and,

---

[5] The Supreme Court recently held that the phrase "is not entitled so to obtain" refers to "those who obtain information from particular areas in the computer—such as files, folders, or databases—to which their computer access does not extend" and does not refer to those "who have improper motives for obtaining information that is otherwise available to them." *Van Buren v. United States*, 141 S. Ct. 1648, 1652 (2021). The question in *Van Buren* is distinct from the question here. Castellano alleges that Ms. Doyle did not have authorization to access the client email list in any circumstance, not that she did so with an improper motive.

as a result, cause[d] harm or loss." § 668.803(1), Fla. Stat. CADRA defines "without authorization" to mean access to a protected computer by a person who is not an authorized user; has stolen a technological access barrier of an authorized user; or circumvented a technological access barrier without the permission of the owner of the information stored on a protected computer. § 668.802(9), Fla. Stat.

Castellano insists that there were internal limits to block Ms. Doyle from accessing more than the commission reports. Castellano thus asserts that the only way Ms. Doyle could have obtained a full client list is by calling the third-party company, PatientNow, that hosted the EMR system and asking it to grant her access to the report. But Castellano has presented no evidence of internal system blocks beyond Dr. Castellano's testimony that he set up these restrictions himself—evidence that was contradicted by Ms. Horton's testimony that no such restrictions existed. More importantly, Castellano presented no evidence that Ms. Doyle called PatientNow or that, if she did, it would help her to download the client list. Castellano's conjectures simply cannot be the basis for the drastic remedy of a preliminary injunction. The Court finds Castellano has not carried its burden to show Ms. Doyle exceeded her authorized access to the client information.[6]

---

[6] Under CADRA, an "authorized user" is defined as someone who has access to the computer instead of someone who has access to the information on the computer. *See* § 668.802(1) (defining an authorized user as one who "is given express permission by the owner, operator, or lessee of the protected computer or by the owner of information stored in the protected computer *to access the protected computer*" (emphasis added)). Therefore, it is not clear that Doyle would have violated the Florida statute even if she accessed *information* that she was not authorized to access if she was authorized to access the computer from which she accessed it.

Further, Castellano has not presented evidence to show that it suffered a loss exceeding $5,000, as required by the CFAA.[7] CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). "'Loss' includes the direct costs of responding to the violation," and this requirement may be satisfied by payment to an outside consultant to assess how the access occurred. *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1172–74 (11th Cir. 2017). In both the Motion for Preliminary Injunction and the Amended Complaint, Castellano alleges costs of more than $5,000 to investigate, assess, and respond to Ms. Doyle's alleged misconduct. (Doc. 24 at 19; Doc. 4 at 18). But no evidence of Castellano's investigatory efforts has been presented besides the allegations in the verified Amended Complaint that merely parrot the statutory language and Dr. Castellano's testimony that he and some assistants spent time looking into the alleged breach of security. Without evidence of actual loss—e.g., receipts from an investigator or the like—the Court finds that Castellano has not shown it is substantially likely to succeed on its CFAA or CADRA claims.

ii. Irreparable Harm

Even if Castellano had proven a substantial likelihood of success on the

---

[7] CADRA does not require a specific amount of loss but does define loss in a similar manner. *See* §§ 668.802(5), 668.803, Fla. Stat.

24

computer fraud claims, it has not satisfied the second prong of the standard for a preliminary injunction. For the reasons stated above—namely that Castellano has presented no proof of a loss of clients, goodwill, or actual, imminent harm stemming from Ms. Doyle's prior alleged violations, and has delayed pursuit of the injunction— Castellano has not shown irreparable harm stemming from its CFAA or CADRA claims.

Importantly for these claims, Castellano does not allege or prove that Ms. Doyle could cause *future* irreparable harm of the kind addressed by CFAA and CADRA. Injunctive relief is prospective relief, intended to protect against injury that might occur if the conduct is not stopped. *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1133 (11th Cir. 2005). Here, there is no threat of harm stemming from inappropriate access of Castellano's computer system, which if it occurred, happened over three years ago, and Castellano has presented no evidence of further inappropriate access. *See Allied Portables, LLC v. Youmans*, No. 2:15-cv-294-FtM-38CM, 2015 WL 6813669, at *4 (M.D. Fla. Nov. 6, 2015) (Chappell, J.) (finding no irreparable injury where alleged CFAA violation occurred more than a year prior and plaintiff presented no other evidence of future harm). *But see Fla. Atl. Univ. Bd. of Trs. v. Parsont*, 465 F. Supp. 3d. 1279, 1296–97 (S.D. Fla. 2020) (Altman, J.) (finding irreparable harm where defendant was still able to access plaintiff's servers and to obtain proprietary information). Accordingly, Castellano has not demonstrated irreparable future harm will result in the absence of an injunction.

Because Castellano has not presented evidence sufficient to show that it is

substantially likely to succeed on either the CFAA or CADRA claim and has not articulated irreparable harm that will result in the absence of injunction, it is not entitled to a preliminary injunction on these claims.

## V.   CONCLUSION

Castellano has shown neither a substantial likelihood of success on the merits of its misappropriation and computer fraud claims, nor any irreparable harm resulting from the alleged violations. Accordingly, the Motion for Preliminary Injunction is **DENIED**. Ms. Doyle may renew her request for attorneys' fees by motion no later than August 11, 2021.

**ORDERED** in Tampa, Florida, on July 28, 2021.

Kathryn Kimball Mizelle
United States District Judge

26